FILED
CHARLOTTE, NC

MAR 17 2016

U.S. DISTRICT COURT
WESTERN DISTRICT OF NC

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

| UNITED STATES OF AMERICA | ) | DOCKET NO. 5:16cr18-RLV |
|---|---|---|
| | ) | |
| | ) | **BILL OF INFORMATION** |
| v. | ) | |
| | ) | Violations: |
| | ) | |
| | ) | 15 U.S.C. § 78j(b) |
| | ) | 17 C.F.R. § 240.10b-5 |
| **CHARLES CALEB FACKRELL** | ) | |
| | ) | |

THE UNITED STATES ATTORNEY CHARGES:

At the specified times and at all relevant times:

1. From in or about May 2012 through in or about December 2014, the defendant CHARLES CALEB FACKRELL, abused his position of trust as a registered securities representative or "stockbroker" and executed what is commonly known as a "Ponzi" scheme to defraud investors by inducing victims in Wilkes County, North Carolina, and elsewhere, to invest in entities he controlled, including Robin Hood LLC, Robinhood, LLC, Robin Hood Holdings LLC, Robinhood Holdings, LLC, and related entities (collectively "Robin Hood"), and to invest in other offerings made by FACKRELL.

2. During the course of the scheme, FACKRELL induced approximately twenty (20) investors to invest approximately $1,400,000, resulting in net losses of approximately $779,983. FACKRELL attempted to solicit additional funds.

3. FACKRELL had acted in the capacity as a registered securities representative to the majority of victim investors, and he steered victim investors away from legitimate investments offered through the securities broker with which he was associated to purported investments in which FACKRELL could access their funds. FACKRELL induced such investments, and attempted to induce additional investments, by making false and fraudulent representations, omitting material facts, and telling deceptive half-truths. Such misrepresentations generally and at various times included, among others, representations that investor money would be invested in, or secured by, gold and other precious metals, when, in truth and fact, FACKRELL spent only a small fraction of investor money on such assets.

    (a) For example, on or about November 1, 2012, FACKRELL stole $200,000 from victim M.W. by representing that M.W.'s money would be invested in a company called Robin Hood that was very safe and was paying a guaranteed return of 7%

1

annually. FACKRELL had acted in the capacity of a registered representative to M.W. in the past, and he steered M.W. away from legitimate investments to this investment, which allowed FACKRELL to access M.W.'s funds for his own personal benefit. FACKRELL also represented that M.W.'s investment was secured by at least "fifty (50) one troy ounce bars of gold." At FACKRELL's direction, M.W. wired $200,000 into a Robin Hood account, which was controlled by FACKRELL. However, FACKRELL did not invest M.W.'s money as promised. Under FACKRELL's direction, in the next several weeks, M.W.'s money was used to make Ponzi payments to other investors, purchase personal items, and otherwise enrich FACKRELL as follows:

    (i) For example, on or about November 1, 2012, $50,000 of M.W.'s money was wired from the Robin Hood account into another account controlled by FACKRELL.

    (ii) On or about November 5, 2012, more than $2,500 in goods were purchased from an art gallery in Lake Tahoe using M.W.'s money from the Robin Hood account.

    (iii) On or about November 8, 2012, $25,000 of M.W.'s money was withdrawn in cash from the Robin Hood account.

    (iv) On or about November 19, 2012, $10,000 of M.W.'s money was wired from the Robin Hood account into another account controlled by FACKRELL and another $2,000 of M.W.'s money was withdrawn in cash from the Robin Hood account.

    (v) On or about November 26, 2012, $5,000 of M.W.'s money was withdrawn in cash from the Robin Hood account and used to purchase an official check payable to FACKRELL.

    (vi) On or about November 29, 2012, $5,000 of M.W.'s money was withdrawn in cash from the Robin Hood account and used to purchase an official check payable to FACKRELL.

    (vii) From November 1, 2012, through December 17, 2012, over $19,000 of M.W.'s money from the Robin Hood account was used to make Ponzi payments to previous investors, including a payment of purported returns generated from M.W.'s investment to M.W. on December 5, 2012.

    (viii) From on or about November 1, 2012, through on or about December 17, 2012, more than $2,000 of M.W.'s money from the Robin Hood account was withdrawn in cash through automatic teller machines in addition to the cash withdrawals identified above.

(ix) From on or about November 1, 2012, through on or about December 17, 2012, over $3,400 of M.W.'s money from the Robin Hood account was spent on numerous hotels in the Winston-Salem, North Carolina area, car washes, groceries, medical expenses, and retail items such as Sam's Club, Wal-Mart, Brookstone, Starbucks, Dick's Sporting Goods, and Dillard's.

(x) From on or about November 1, 2012, through on or about December 17, 2012, no other deposits over $1.00 were made in the Robin Hood account.

(b) Similarly, on or about April 2, 2013, FACKRELL stole $50,000 from victim T.E. by representing that T.E.'s money would be invested in a company called RobinHood LLC that was very safe and was paying a guaranteed return of 5% annually. FACKRELL had acted in the capacity of a registered representative to T.E. in the past, and he steered T.E. away from legitimate investments to this investment, which allowed FACKRELL to access T.E.'s funds for his own personal benefit. FACKRELL also represented that T.E.'s investment was secured by "25 troy ounces" of gold. Under FACKRELL's direction, T.E.'s money was deposited into a Robin Hood account, which he controlled. Over the next several weeks, the funds were used to make Ponzi payments to previous investors, purchase personal items, and otherwise enrich FACKRELL as follows:

(i) For example, from on or about April 2, 2013, to on or about May 2, 2013, over $8,500 of T.E.'s money from the Robin Hood account was used to make over 75 individual purchase transactions from Apple iTunes.

(ii) From on or about April 2, 2013, to on or about May 2, 2013, approximately $11,000 of T.E.'s money from the Robin Hood account was transferred into another account controlled by FACKRELL via checks made payable to FACKRELL.

(iii) From on or about April 2, 2013, to on or about May 2, 2013, over $14,000 of T.E.'s money from the Robin Hood account was used to make Ponzi payments to previous investors.

(iv) From on or about April 2, 2013, to on or about May 2, 2013, approximately $2,600 of T.E.'s money from the Robin Hood account was withdrawn in cash through automated teller machines and another approximately $1,600 was withdrawn in cash at bank branches.

(v) From on or about April 2, 2013, to on or about May 2, 2013, T.E.'s money from the Robin Hood account also was spent on items unrelated to T.E.'s investment, to include retail purchases made at Costco, PetSmart, Bojangles, and car washes.

3

(vi) From on or about April 2, 2013 to on or about May 2, 2013, the only other deposit in the Robin Hood account was in the amount of $4,000.

4. In total, FACKRELL diverted over $700,000 of investor money (nearly half of the investor money he obtained) back to other investors in Ponzi fashion, such as to make "interest" payments, to return funds to investors who demanded their money back, and to induce further investments by investors and their friends and family members.

5. FACKRELL also diverted investor money to support FACKRELL's personal lifestyle by, among other things, making hundreds of thousands of dollars of cash withdrawals, as well as making purchases related to Apple iTunes, automotive care, medical expenses, entertainment, groceries, hotel expenses, and numerous other retail items. FACKRELL also used investor money to pay a monetary settlement he reached with a previous employer in the securities industry.

## COUNT ONE
### (Securities Fraud)

6. The United States Attorney realleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 5 of this Bill of Information, and further alleges that:

7. From in or about May 2012 through in or about December 2014, in Wilkes County, within the Western District of North Carolina and elsewhere, the defendant,

**CHARLES CALEB FACKRELL**

willfully, directly and indirectly, by use of the means and instrumentalities of interstate commerce and the mails, used and employed manipulative and deceptive devices and contrivances by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would and did operate as a fraud and deceit upon investors and others, in connection with the sale of securities, to wit: the investments in Robin Hood and other investments offered by FACKRELL set forth above.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff and Title 17, Code of Federal Regulations, Section 240.10b-5.

## NOTICE OF FORFEITURE

Notice is hereby given of 18 U.S.C. § 982 and 28 U.S.C. § 2461(c). Under Section 2461(c), criminal forfeiture is applicable to any offenses for which forfeiture is authorized by any other statute, including but not limited to 18 U.S.C. § 981 and all specified unlawful activities listed or referenced in 18 U.S.C. § 1956(c)(7), which are incorporated as to proceeds by Section 981(a)(1)(C). The following property is subject to forfeiture in accordance with Section 982 and/or 2461(c):

   a. All property which constitutes or is derived from proceeds of the violations set forth in this bill of information; and

   b. If, as set forth in 21 U.S.C. § 853(p), any property described in (a) cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with, a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, all other property of the defendant/s to the extent of the value of the property described in (a).

The following property is subject to forfeiture on one or more of the grounds stated above:

   a. A forfeiture money judgment in the amount of at least $779,983, such amount constituting the proceeds of the violations set forth in this Bill of Information;

   b. All U.S. and foreign currency, gold and other precious metals, and gemstones seized on or about December 1, 2014, from the Cadillac driven by FACKRELL.

JILL WESTMORELAND ROSE
UNITED STATES ATTORNEY

DANIEL RYAN
ASSISTANT UNITED STATES ATTORNEY

5